UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
———

| | | |
|---|---|---|
| RANDOLPH MASON JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:04-cv-38 |
| | ) | |
| v. | ) | Honorable Joseph G. Scoville |
| | ) | |
| CITY OF BATTLE CREEK, et al., | ) | |
| | ) | **OPINION** |
| Defendants. | ) | |
| _____ | ) | |

This is a civil rights action brought by a former executive official of the City of Battle Creek arising from his termination from employment on December 15, 2003. Plaintiff's fourth amended complaint set forth fifteen causes of action against the City of Battle Creek and four of its employees. By stipulation and order entered April 4, 2005 (docket # 91), all claims against defendants Taylor and Tsuchiyama were dismissed. The claims against the remaining defendants the City of Battle Creek, Wayne Wiley (acting City Manager), and Russell Claggett (deputy City Attorney in charge of employee relations) were narrowed to the following:

Count 1: a section 1983 claim for abridgement of plaintiff's free speech rights;

Count 2: a section 1983 conspiracy claim for abridgement of plaintiff's free speech rights;

Count 6: a section 1981 claim for wrongful discharge on account of race;

Count 11:  a pendent state-law claim for failure to conduct a fair and just

investigation, under Mich. Const. 1963, art. 1 § 17.

(Stipulation and Order, docket # 91).  In addition, at oral argument plaintiff's counsel continued to

press a due-process claim arising from the alleged failure of defendants to afford plaintiff adequate

process in connection with the termination decision.  Although this claim had been pleaded as count

10, that count had been dismissed by the stipulation and order of April 4.  (docket # 91).

After the close of discovery, defendants moved for summary judgment as to all

claims.  (docket # 67).  The parties have consented to the dispositive jurisdiction of a magistrate

judge pursuant to 28 U.S.C. § 636(c) (*see* Consent and Order of Reference, docket # 14).  The court

conducted a hearing on defendants' motion for summary judgment on April 20, 2005.  For the

reasons set forth below, defendants' motion for summary judgment will be granted as to all

remaining federal claims; plaintiff's pending state-law claim will be dismissed without prejudice.

## **Summary Judgment Standard**

As the Sixth Circuit has noted, the federal courts have entered a "new era" in

summary judgment practice.  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995);

*Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1478-81 (6th Cir. 1989).  While preserving the

constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to

weed out unsupported claims before trial.  Summary judgment is appropriate when the record reveals

that there are no issues as to any material fact in dispute and the moving party is entitled to judgment

as a matter of law.  FED. R. CIV. P. 56(c); *Kocak v. Community Health Partners of Ohio, Inc.*, 400

F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005);

*Gettings v. Building Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 305 (6th Cir. 2003). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Terry v. LaGrois*, 354 F.3d 527, 530 (6th Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see Rainer v. Union Carbide Corp.*, 402 F.3d 608, 614 (6th Cir. 2005); *Martingale LLC v. Louisville*, 361 F.3d 297, 301 (6th Cir.), *cert. denied*, 125 S. Ct. 453 (2004).

The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005); *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). The party moving for summary judgment bears the initial burden of pointing out to the district court that there is an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once defendants show that "there is an absence of evidence to support the nonmoving party's case," plaintiff has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## Findings of Undisputed Facts

The essential chronology of events leading up to plaintiff's termination from employment is not subject to dispute, as it is well documented in the City's records. In those

instances in which the evidence presented by the parties differs, the court accepts (as it must for summary judgment purposes) plaintiff's version of events, as long as evidence exists upon which a reasonable jury could find for the plaintiff on that issue.

Plaintiff, Randolph Mason Johnson, is a black man.  He was employed by the City of Battle Creek in November of 1986.  The City promoted him to Superintendent of Streets and Parks, effective December 25, 2000.  Plaintiff's employment with the City was terminated effective December 15, 2003, by defendant Wayne Wiley, then the acting City Manager.

The events leading up to plaintiff's termination from employment began on June 24, 2003.  At that time, plaintiff was questioning a subordinate employee, Lee Taylor, regarding Taylor's apparent violation of City policy.  Taylor had brought his personal lawn mower to the City's equipment center for repairs, in violation of policy.  Plaintiff summoned Taylor and Taylor's immediate supervisor, Michael Doubleday, to accompany plaintiff to the equipment center to discuss the issue.  An argument ensued, during which Taylor remarked that if someone were to go to plaintiff's home, they would find city equipment there.  Plaintiff responded, in front of a number of witnesses, "If anyone comes snooping around my house, they might get a cap busted in their ass."  Plaintiff admits making the statement and admits that this is a way of saying that "a trespasser might get shot in his posterior."  (Fourth Amended Complaint, ¶ 113, docket # 45).[1]

At some time (undisclosed in the record), Lee Taylor verbally reported plaintiff's comment to Patricia Taylor, a Human Resources Manager for the City.  By letter dated July 23, 2003

---

[1] Earlier in the month of June, the City had disciplined plaintiff with a five-day unpaid suspension for possessing a handgun while driving a city vehicle.  Although plaintiff had a permit for the gun, it nevertheless violated the city code for plaintiff to possess it on city property.  (Claggett Aff., ¶ 6, docket # 71, Ex. D).

(Def. Ex. K, docket # 72), Patricia Taylor followed up on the report, which she characterized as a complaint concerning "violence in the workplace." Ms. Taylor reminded Mr. Taylor that he had promised to write down a narrative of what had occurred between him and plaintiff, along with a "Violence in the Workplace complaint form." Mr. Taylor finally filed a written report with the Human Resources Department on September 4, 2003 (Def. Ex. M, docket # 72), in which he reported plaintiff's statement concerning putting a "cap in your ass."

On October 30, 2003, defendant Claggett and Ken Tsuchiyama (plaintiff's immediate supervisor) interviewed plaintiff about Mr. Taylor's complaint. During the interview, plaintiff repeated allegations that he had heard to the effect that someone in the Human Resources Department had asked Jerome Clark (one of plaintiff's subordinates) to cooperate in the investigation and had promised Clark plaintiff's job if he did so. Mr. Claggett conducted a series of interviews to investigate plaintiff's accusations concerning the alleged inducements made to Clark to secure his cooperation. Claggett could find no support for plaintiff's allegations. In fact, Randy Kurtsman, who had been present as a union representative when Clark had been interviewed, confirmed that no one from the Human Resources Department had offered Clark any incentive for his cooperation in the investigation. During the course of these interviews, however, Claggett learned that plaintiff had appeared at Mr. Clark's home to ask him about the investigation, an action that Claggett deemed to be improper.

Wiley, Claggett and Tsuchiyama met with plaintiff on November 18, 2003, and gave him a letter (Def. Ex. P, docket # 73) signed by Wiley as acting City Manager. The letter summarized the results of the investigation and concluded that plaintiff's statement to Taylor, which plaintiff admitted making, violated the City's violence in the workplace policy. That policy (Def. Ex. J,

docket #72) subjects city employees to discipline for overt acts of violence (*e.g.*, fighting, possession of weapons) as well as "threats or intimidating verbal or physical conduct." The letter also referred to plaintiff's allegations of misconduct on the part of human resources personnel, which investigation had shown to be unsupportable. Wiley's letter determined that plaintiff's false statements violated section 296.03(n) of the city ordinances, which made it a dischargeable offense to make false statements in an official city investigation. The letter informed plaintiff of Wiley's intent to terminate his employment on these two grounds. The letter placed plaintiff on administrative leave with pay and informed him of his opportunity to respond to the two charges, either in writing or in person, and scheduled a meeting for that purpose on November 20. Wiley's letter stated that a final determination regarding termination from employment would be made after reviewing plaintiff's response.

Discussion at the November 18th meeting reinforced the contents of the letter. In his deposition (pp. 98-99, docket # 92, Ex. H), plaintiff testified that Wiley told him during the meeting that Wiley had not yet made up his mind to terminate plaintiff's employment and that he wanted to give plaintiff a chance to respond to the charges and "try to recall or have anything that is going to help you." Wiley also instructed plaintiff not to go into detail with anyone concerning the investigation. (Plf. Dep., 230-31, docket # 92, Ex. I).[2] Plaintiff characterized Wiley's instruction as a "gag restriction" that had the effect of restricting him from confiding in Clark, one of plaintiff's best friends. (*Id.*, 258-59).

---

[2] Wiley contends that he specifically told plaintiff not to discuss the investigation with Clark. For purposes of the summary judgment motion, however, the court must accept plaintiff's version of events.

As contemplated in Wiley's previous letter, the parties met on November 20, 2003, to give plaintiff an opportunity to respond to the allegations in the letter.  Wiley, Claggett, and Tsuchiyama were present on behalf of the City.  Plaintiff was accompanied by Chris Dopp, another city employee, as his representative.  During the course of the meeting, the city officials learned that plaintiff had met with Mr. Clark on the evening of November 18th, an act that the City deemed in violation of Wiley's previous instructions.  A subsequent interview with Clark determined that plaintiff appeared at Clark's home on the evening of November 18th and inquired concerning what Clark had told city officers in his interview.  Clark refused to discuss the investigation and specifically refused plaintiff's request to change his testimony.  Clark's deposition testimony, which is unrefuted in the record, was as follows:

> Q.    Okay.  And when Randy came to your house, did Randy get the opportunity to discuss the investigation with you?
>
> A.    He talked about it, I listened.  I would not discuss it.  I's [sic] told him that I had direct orders not to discuss it.
>
> Q.    Okay.  You did state -- when you say that Randy talked about it, what in fact did Randy say?
>
> A.    He told me that this was serious, he could lose his job.  He wanted me to tell him what I knew.  I told him I didn't know anything.
>
> Q.    Okay.  Did Randy ask you to lie about anything?
>
> A.    Can I have a minute with her?
>
> Q.    Yes.  You may.
>            (Short break off the record, after which the following proceedings took place:)
>
> Q.    (By Ms Pugh)  To clarify, on that date, the November when he came to your home, did Randy ask you to lie about anything?

A.      I would say that -- I wouldn't say that he asked me to lie.  He asked me to change what I had told them.

Q.      Okay.  So you wouldn't say he asked you to lie.  In what way did Randy ask you to change?  Can you explain that?

A.      He asked me, when I talked to him, when I told Wayne Wiley that Randy had been to me and discuss the case, he wanted me to tell Wiley that, no, we hadn't talked about the case.

Q.      Okay.  You have answered that question.
        What was -- what was your response to that?

A.      I said, "Randy, I can't talk about the case."

Q.      Okay.  So you just kept saying, "I can't talk about the case"?

A.      I was given a direct order and I didn't want to violate the direct order, so I would not discuss it at all.

(Clark Dep., 47-48, docket # 93, Ex. D).

        On November 24, 2003, plaintiff delivered a letter to Wiley (Def. Ex. Z, docket # 73), claiming that the actions by the City constituted unlawful employment discrimination in violation of Title VII of the Civil Rights Act of 1964 and threatening litigation.

        In a letter dated December 1, 2003 (Def. Ex. W, docket # 73), Wiley added a third ground for discipline, arising from plaintiff's denial that he had discussed the investigation with Clark on November 18, 2003.  The letter also added a further charge, asserting that plaintiff's discussion with Clark on the evening of November 18th violated Wiley's instructions and constituted insubordination.  The letter scheduled a meeting on December 4, 2003, for the purpose of discussing plaintiff's response to the additional allegations and any further response to the original allegations.

        On December 4, 2003, Wiley, Claggett, and Tsuchiyama again met with plaintiff and his representative, Chris Dopp.  Plaintiff admitted going to Clark's home on the evening of

-8-

November 18, 2003.  He also admitted speaking with him about the investigation and referring to

the November 18th letter during the discussion.

Wiley terminated plaintiff's employment effective December 15, 2003.  On January

14, 2004, plaintiff sent Wiley a letter requesting a post-termination hearing.  (Hearing Ex. 1).  Wiley

responded by letter dated January 16, 2004, in which he informed plaintiff of his right to pursue a

grievance under section 296.12 of the Administrative Code and offered to schedule an appointment

for this purpose.  (Hearing Ex. 2).  The record does not disclose any further pursuit by plaintiff of

this remedy.  The City replaced plaintiff with Jerome Clark, who is also a black male.  This lawsuit

followed.

## Discussion

### I.        Counts 1 and 2:  Violation of Free Speech Rights

Counts 1 and 2 of the fourth amended complaint assert essentially one cause of

action -- abridgement of plaintiff's First Amendment right to free speech.  Count 1 alleges that the

City's violence in the workplace policy, which prohibits verbal threats against coworkers, is a prior

restraint of speech and is overbroad, in violation of the First Amendment.  Count 2 alleges a claim

under 42 U.S.C. § 1983 for conspiracy to terminate plaintiff's employment in retaliation for his

exercise of free speech.[3]

---

[3] As originally pled, count 2 also asserted a section 1983 conspiracy claim to terminate
plaintiff on account of his race.  Plaintiff's counsel made clear in the reply brief (docket # 92) and
again during oral argument that plaintiff was abandoning the racial conspiracy claim and was
pursuing count 2 only on a First Amendment theory.

A.     Prior Restraint and Overbreadth

Count 1 challenges the City's policy against violence in the workplace (Def. Ex. J), contending that the policy is a prior restraint against free speech and is overbroad.  The policy statement recites that the City will not tolerate "any form of workplace threats or violence," including verbal or physical threats "as well as forms of intimidation such as sexual harassment or abusive language."  (Def. Ex. J at 1, docket # 72).  The policy contains a list of offenses that may result in discipline, up to and including immediate discharge.  Among the listed offenses is the following:

> 2.     Abuse of others, including threats or intimidating verbal or physical conduct, use of abusive or obscene language, harassment, or interference with other employees' ability to perform their jobs.

(Def. Ex. J at 2).

Plaintiff's challenge to this policy as a "prior restraint" requires little discussion.  The Supreme Court has defined a prior restraint as "an administrative or judicial order forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 549 (1993).  In other words, a prior restraint exists "when speech is conditioned upon the prior approval of public officials."  *Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville & Davidson County, Tenn.*, 274 F.3d 377, 391 (6th Cir. 2001).  The doctrine of prior restraint does not apply when the speaker is faced with post-publication punishment.  *Alexander*, 509 U.S. at 553-54.  In the present case, the City did not impose a regime of censorship or require prior approval of speech under the workplace violence policy.  Rather, the City established a system of post-publication discipline for certain conduct, including threats and

-10-

verbal harassment. The jurisprudence governing prior restraints is inapplicable, because the policy clearly falls outside of the definition of prior restraints.

Plaintiff's challenge to the policy under the overbreadth doctrine is similarly meritless. The overbreadth doctrine provides an exception to the traditional rules of standing and allows a party not yet affected by a statute or ordinance to bring actions under the First Amendment based on the belief that the statute or ordinance is so broad as to chill the exercise of free speech and expression. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *United States v. Blaszak*, 349 F.3d 881, 888 (6th Cir. 2003); *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990). A statute is unconstitutional on its face on overbreadth grounds if there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Beyond hurling the charge of "overbreadth," plaintiff provides no analysis of the essential question in an overbreadth case -- the existence of a realistic danger that the ordinance, because of the breadth of its language, would act to chill the exercise of free speech. Plaintiff does not suggest any protected expression that would fall within the proscription of the workplace violence policy. Certainly, the policy is content-neutral, and does not seek to prohibit some threats of violence, while allowing others, based on the motivation of the speaker. Rather, all violence and threats of violence are prohibited. *Cf., R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (striking down on overbreadth grounds ordinance that proscribed display of any symbols communicating messages of racial, gender, or religious intolerance). The federal courts have recognized that workplace threats, sexually derogatory comments, and other workplace misconduct are a form of "fighting words," which are not protected speech. *See R.A.V.*, 505 U.S. at 389-390; *Jarman v. City of Northlake*, 950 F. Supp.

-11-

1375, 1379 (N.D. Ill. 1997).  "[L]ike violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, such practices are entitled to no constitutional protection."  *Roberts v. United States Jaycees*, 468 U.S. 609, 628 (1984).

The City's anti-violence policy bears no relevant resemblance to campus anti-harassment policies that have been found overbroad by the federal courts.  For example, the Central Michigan University policy examined by the Sixth Circuit in *Dambrot v. Central Michigan University*, 55 F.3d 1177 (6th Cir. 1995), was found by the court to be sweepingly drafted, so as to reach protected as well as unprotected speech.  The challenged policy prohibited any verbal or nonverbal behavior that subjects an individual "to an intimidating, hostile, or offensive educational, employment, or living environment."  55 F.3d at 1182.  The court found that the broad scope of the policy's language presented a "realistic danger" that the university could compromise protection afforded by the First Amendment.  *Id.* at 1183.  By contrast, the policy of the City of Battle Creek prohibits only acts of violence, abuse of others, and threats or intimidating verbal or physical conduct, none of which is entitled to constitutional protection.  Plaintiff has failed to show any "realistic danger" that the language of the policy is so broad as to chill the exercise of free speech by city employees.  His overbreadth challenge must therefore be rejected.

B.     First Amendment Retaliation Claim

Plaintiff asserts a violation of his right to free speech under the First Amendment. He argues that defendants retaliated against him for engaging in protected speech.  To establish a prima facie case, plaintiff must demonstrate:  (1) that he was engaged in a constitutionally protected speech; (2) that the defendants' adverse action caused him to suffer an injury that would likely chill

-12-

a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to his exercise of constitutionally protected rights. *See Timm v. Wright State Univ.*, 375 F.3d 418, 422-23 (6th Cir. 2004); *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 965 (6th Cir. 2002); *Sharp v. Lindsey*, 285 F.3d 479, 484 (6th Cir. 2002).

"In *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court established a two-part inquiry for determining when the discharge of a public employee violates the First Amendment. The threshold question is whether the employee's speech may fairly be characterized as constituting speech on a matter of public concern. If the speech relates to a matter of public concern, then the court employs the balancing test outlined in *Pickering v. Board of Education*, 391 U.S. 563 (1968), to determine if the employee's free speech interests outweigh the efficiency interests of the government as an employer." *Rose v. Stephens*, 291 F.3d 917, 920 (6th Cir. 2002) (citations omitted); *see Sharp v. Lindsey*, 285 F.3d at 485-86. Because of the need to provide government officials with the ability to manage their offices without intrusive oversight by the judiciary, the court's concern must be to protect those expressive activities of a public employee when he speaks as a citizen on a public matter, a concern that ordinarily does not extend to a public employee speaking on matters only of his personal interest. *See Rose*, 291 F.3d at 923. "A public employee's speech dealing with 'matters only of personal interest' is generally not afforded constitutional protection." *Vaughn v. Lawrenceberg Power Sys.*, 269 F.3d 703, 716 (6th Cir. 2001). "The Supreme Court has elaborated on this definition by characterizing unprotected speech as 'speech that involves nothing more than a complaint about the employee's own duties [w]hich may give rise to discipline without imposing any special burden of justification on the government employer.'"

-13-

*Vaughn*, 269 F.3d at 716 (quoting *United States v. National Treasury Employees Union*, 513 U.S. 454, 466 (1995)).

Whether speech addresses a matter of public concern is a question of law for the court to decide.  *See Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).  "A public concern is one relating to 'any matter of political, social, or other concern to the community.'"  *Gragg*, 289 F.3d at 965 (quoting *Connick*, 461 U.S. at 146).  A court determines whether speech addresses a matter of public concern by looking to the "content, form and context of a given statement, as revealed by the whole record."  *Connick*, 461 U.S. at 147-48; *Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 276 (6th Cir.), *cert. denied*, 540 U.S. 813 (2003).

In this case, plaintiff asserts that the City terminated him in retaliation for two instances of protected speech.  First, plaintiff asserts that his statement to Clark on June 24, 2003, that "If anyone comes snooping around my house they might get a cap busted in their ass," is protected speech.  Second, plaintiff argues that his report to Wiley and Claggett on November 18, 2003, concerning alleged inducements made to Clark by members of the Human Resources Department was also protected.[4]

In judging plaintiff's retaliation claim under First Amendment principles, this court finds dispositive guidance in the recent Sixth Circuit decision in *Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004).  *Farhat* involved a First Amendment retaliation claim by a former employee of a school

---

[4] Review of plaintiff's Fourth Amended Complaint reveals that he never alleged that his report to Wiley and Claggett was protected speech.  Rather, he alleged that his "bust a cap" comment and his statements to Mr. Clark in violation of the "gag order" were protected.  (¶¶ 142, 239, 242, docket # 45).  At oral argument, plaintiff's counsel withdrew the latter claim in light of the square holding in *Farhat* that such instructions, limited in both time and scope and designed to ensure the integrity of the investigative process, do not violate First Amendment rights.  370 F.3d at 598.

district, who was terminated after making threats of violence to a co-worker.  In *Farhat*, as in the present case, the letter of termination specifically stated that plaintiff was being terminated for this and other speech deemed offensive by the administration.   After reviewing First Amendment jurisprudence under *Connick v. Meyers* and its progeny, the court determined that, in analyzing whether an employee's speech is a matter of public concern, the lower court must determine the focus of the speech, the point of the speech in question, to what purpose the employee spoke, the intent of the speech, and the communicative purpose of the speaker.  370 F.3d at 592.  The *Farhat* court went on to observe that the proper inquiry is not what might be "incidentally conveyed" by the speech, and that passing or fleeting references to an arguably public matter do not elevate the speech to a matter of public concern where the focus or point of the speech advances only a private interest. *Id.* at 592-93 (citing *Rodgers v. Banks*, 344 F.3d 587, 597-98 (6th Cir. 2004)).  Applying this test, the court determined that the primary focus, point, and communicative purpose of the employee's speech was his own personal grievance with the school district concerning his job situation, and that his references to collusion or corruption were passing and incidental.  The court therefore determined that plaintiff's speech was not a matter of public concern.  *Id.* at 593.

Application of the foregoing principles leads to the conclusion that neither of the statements involved in this case involve matters of public concern.  It can scarcely be argued that a statement in the workplace, whether meant as a threat or a joke, to the effect that anyone who comes around the speaker's property will get a "cap in his ass" involves a matter of public concern.  The statement does not involve the "political, social, or other concern to the community."  *Connick*, 461 U.S. at 146.  The content, form, and context disclose that the statement was made in the course of plaintiff's duties as a supervisor, in which he was pursuing a possible violation of city policy by a

subordinate and was in turn responding to an allegation by the subordinate that plaintiff himself had taken public property home. In this context, plaintiff made a not-so-veiled threat of physical harm to anyone who would come snooping around his property. Plaintiff's statement was gratuitous, unprofessional, and had nothing to do with matters of public concern. In an effort to deflect attention from the actual words he used, plaintiff argues that the entire context of the statement involved a matter of public concern, namely, the subordinate's misuse of city resources. If the City had disciplined plaintiff for objecting to the misuse of public resources, this would be a much different case. The record is patently clear, however, that the City based its discipline on plaintiff's use of threatening language, and not on his decision to investigate possible wrongdoing by a subordinate. In the words of the *Farhat* court, the "focus" and "point" of the speech in question was to deliver a threat (whether real or in jest) to another employee. Whatever the motivation and intent of the speech, it had nothing to do with a public concern. The relationship of the threatening speech to the subordinate's violation of policy (which arguably was a matter of public concern) was only passing or fleeting, if it existed at all. "An employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements." *Waters v. Churchill*, 511 U.S. 661, 681 (1994) (plurality opinion).[5]

Consequently, the court concludes that plaintiff's statement concerning shooting someone in the posterior was not a matter of public concern and therefore was not protected speech.

---

[5] Plaintiff argues strenuously that his statement was jocular, that it was not perceived as a threat by those hearing it, and that Mr. Taylor did not feel subjective fear, as he was a person of much greater size than plaintiff. These arguments all miss the mark. The question for First Amendment purposes is whether plaintiff's statement was protected speech. If it was not, the inquiry is at an end. *Dambrot*, 55 F.3d at 1186. The merits of the City's disciplinary decision are not properly before the court in a First Amendment case. *Id.*

Even if the statement were protected, however, the *Pickering* balancing test reveals that the employer's interest far outweighed any minimal interest that plaintiff might have in uttering these words. Application of the *Pickering* balancing test is also a matter of law for the court. *See Leary v. Daeschner*, 349 F.3d at 898. Under this test, the court must arrive at a balance between the interest of the employee as a citizen in commenting upon matters of public concern and the interest of the government as an employer in promoting the efficiency of public service it performs through its employees. *Pickering*, 391 U.S. at 568. Again, the *Farhat* case provides authoritative guidance. In *Farhat*, the court determined that plaintiff's threatening and abusive language, even if protected under the First Amendment, created a disruption in the workplace, which "outweighed any value his expression might have had." 370 F.3d at 593. The court relied on the plurality opinion in *Waters v. Churchill*, 511 U.S. 661 (1994), in which the Supreme Court remarked that an employer may, consistent with the First Amendment, certainly prohibit its employees from being rude to customers as well as other employees and supervisors. *Farhat*, 370 F.3d at 594. Consequently, the government as employer has efficiency concerns that give it greater discretion in dealing with a disruptive employee, "more discretion than it would have to deter speech by a private citizen." *Id.* The same considerations require the court in the present case to determine, as a matter of law, that the *Pickering* balance tips decidedly towards the interest of the employer in preventing violence, threats, and disruption in the workplace arising from abusive language, even if that language is minimally protected.

Plaintiff also argues that his report to Mr. Wiley and Mr. Claggett on November 18th concerning inducements allegedly made to Mr. Clark by the Human Resources investigators was protected speech. As noted above, this claim is not found in any of plaintiff's complaints in this

matter.  It was raised for the first time in plaintiff's briefing.  Nevertheless, the court will examine this claim under First Amendment principles.

Plaintiff focuses completely on the content of his statement, which he characterizes as a complaint concerning corruption in the Human Resources Department, a matter of public concern.  Although the content of the statement may point in the direction of a public concern, the content alone is not dispositive.  Rather, the court must evaluate the context as well, looking at the "point" of the speech and its communicative purpose.  *Farhat*, 370 F.3d at 592.  These factors point decidedly toward a finding that the "point" of plaintiff's speech was his own difficulties as employee and not a concern by a citizen for the regularity of the City's operations.  "First Amendment protection extends to a public employee's speech when he speaks as a citizen on a matter of public concern, but does not extend to speech made in the course of acting as a public employee."  *Thompson v. Scheid*, 977 F.2d 1017, 1020 (6th Cir. 1992); *accord Akers v. McGinnis*, 352 F.3d 1030, 1036-38 (6th Cir.), *cert. denied*, 125 S. Ct. 656 (2004) (Federal courts do not review personnel decisions reacting to an employee's behavior when the employee "speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest.").  Plaintiff was present in Wiley's office only because he had been summoned there to answer charges of wrongdoing, which were being investigated by the Human Resources Department.  In this context, he leveled a charge against two members of the department, stating that he heard from "someone" that Human Resources employees had offered Mr. Clark an inappropriate inducement during the investigation.  As in *Farhat*, the allegation of "collusion or corruption" came only as a counterattack in response to an already pending investigation.  The "point" of plaintiff's speech was clearly to influence the investigation against him as an employee rather than to speak out as a citizen on a

-18-

matter of public concern.[6]  Plaintiff's complaints of unfairness in the investigation of his alleged

wrongdoing were clearly lodged in his capacity as employee, not public citizen, and they were

unprotected.  *See Farhat*, 370 F.3d at 586, 593 (employee's statements in response to reprimands

that supervisors were "plotting against him" and were corrupt not protected); *Thompson*, 977 F.2d

at 1021 (employee criticism of procedures in fraud investigation was matter of "internal departmental

policy," not "speaking out on matters of public concern"); *Barnes v. McDowell*, 848 F.2d 725, 734-

35 (6th Cir. 1988) (employee's allegations of public corruption were "quintessential employee beef"

of management incompetence and were unprotected).

In addition, plaintiff's claim falters on the second legal issue to be determined by the

court -- the balance of interests.  The record is clear that plaintiff was not disciplined for the mere

making of the statement.  Indeed, city officials took the statement seriously and conducted a full

investigation.  Rather, plaintiff was disciplined only after the City's investigation showed the

allegation to be false.  In such circumstances, the interest of the municipal employer in the integrity

of the investigation and disciplinary system outweighed any interest of plaintiff in making the

accusations.

The Supreme Court has never held that a public employee may not be disciplined on

the basis of the employee's speech.  To the contrary, the entire *Pickering-Connick* line of cases

establishes that employee speech, even if protected, may be the occasion of discipline if the public

employer bears its burden of showing that its legitimate interests outweigh the employee's interest

in speaking.  *Pickering*, 391 U.S. at 568.  In applying the *Pickering* balancing test, the court is not

---

[6] The fact that plaintiff's accusations may have been false does not, in itself, govern the
question whether they involved a matter of public concern.  *Farhat*, 370 F.3d at 591.

required to determine whether plaintiff's report was in fact false.  Rather, the court must assess plaintiff's speech as the City reasonably believed it to be, after an adequate investigation, when making the decision to terminate him.  *See Waters*, 511 U.S. at 676; *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000) ("Under *Pickering* balancing, we assess [plaintiff's] speech as the department reasonably believed it to be, after adequate investigation, when making the decision to terminate [plaintiff].")

In the present case, one of the stated grounds for plaintiff's termination was his making of allegedly false statements during an official investigation, in violation of section 296.03(n) of the city code, which made it a dischargeable offense for an employee to make false statements in an official city investigation.  (*See* Letter of 11/18/03, Def. Ex. P, docket # 73).  Even assuming that statements made by municipal employees during an official investigation involve matters of public concern, the Supreme Court has never held that public employers must tolerate false reports or that they are disabled from disciplining an employee found to have made false statements after an adequate investigation.  In this regard as well, the Sixth Circuit decision in *Farhat* is instructive.  In that case, the court applied the *Pickering* balancing test in a case in which a public employee challenged the employer's instruction to refrain from speaking to other employees about a pending investigation.  Although the court recognized that the restraint could involve a matter of public concern, it nevertheless concluded that the employer's interest in the integrity of its investigation outweighed the employee's interest in speaking during the short period of the investigation.  370 F.3d at 598.  Similarly in the present case, the City had a clear interest in the integrity of its investigations and an equally strong interest in discouraging false statements and reports.  False accusations made during an official investigation imperil the careers of innocent

employees, divert municipal resources, impede legitimate investigations, and can cause a disruption in morale and efficiency in the workplace. In the present case, the record shows that city employees were forced to conduct a series of interviews in response to plaintiff's accusations, and that the interviews disclosed no support for his contentions. Plaintiff has adduced no evidence tending to show that the investigation was somehow inadequate or that city officials unreasonably concluded that plaintiff's accusations were false. *See Waters*, 511 U.S. at 677-78.[7]

In summary, the court concludes that neither of the statements underlying plaintiff's First Amendment retaliation claim constituted protected speech. Furthermore, even if plaintiff's speech were protected, the employer's interest far outweighed plaintiff's interest in speaking. The court makes these determinations as a matter of law, on the basis of the undisputed facts now of record. Defendants are therefore entitled to a summary judgment on all plaintiff's First Amendment claims.[8]

---

[7] In an effort to undermine the City's conclusion that plaintiff's accusations were false, plaintiff has filed the affidavit of Joseph Eugene Brown (Pl. Ex. J, docket # 92). The Brown affidavit repeats a statement by Jerome Clark, in which Clark reportedly said that Paul Engels of the Human Resources Department told Clark to start keeping a file and to document events to assist the Human Resources Department in its investigation of plaintiff. The Brown affidavit does not state or imply that Engels offered Clark any inducement in exchange for his requested cooperation. Plaintiff was discharged for falsely accusing Engels of offering Clark an improper inducement, not for requesting Clark's cooperation. The Brown affidavit establishes only that Engels asked for Clark's help, a perfectly legitimate request. The Brown affidavit does not raise a triable issue of fact concerning the adequacy of the investigation leading up to plaintiff's discharge or the good faith of the City in concluding that plaintiff had made a false statement during an official investigation.

[8] Plaintiff's complaint alleges, in addition to retaliation, a claim for conspiracy. *Farhat* again provides the answer. In the absence of proof of unlawful action by defendants, plaintiff cannot prove conspiracy. 370 F.3d at 599. The conspiracy claim therefore falls with the underlying First Amendment claim.

## II.     Count 6:  Wrongful Discharge Under 42 U.S.C. § 1981

Plaintiff alleges that his termination from employment was motivated by his race. He brings suit pursuant to 42 U.S.C. § 1981, which prohibits racial discrimination in the making and enforcing of private contracts.  It is now well settled that the elements of a *prima facie* case as well as the allocations of the burden of the proof applicable to Title VII claims also apply in claims under section 1981.  *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 719 (6th Cir. 2005); *Johnson v. University of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000).

In both Title VII cases and cases brought under section 1981, a plaintiff facing a motion for summary judgment has the initial burden of establishing a *prima facie* case of discrimination by defendants.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  A plaintiff may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by the defendant or showing the existence of circumstantial evidence creating an inference of discrimination.  *Id.* at 802.  Under the second approach, the plaintiff must show (1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class.  *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).  The fourth element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably.  *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).

In the present case, plaintiff has not established a *prima facie* case of discrimination in any of the allowable ways.  First, plaintiff's counsel candidly admitted at oral argument that plaintiff has no direct evidence of intentional discrimination by any defendant.  The court's

independent review of the record confirms this concession.  Second, plaintiff's counsel further admitted that plaintiff has no evidence to indicate that a similarly situated non-protected employee was treated more favorably than plaintiff, a conclusion with which this court concurs after review of the record.  Finally, it is undisputed that plaintiff was not replaced by a person outside of the protected class.  To the contrary, he was replaced by Jerome Clark, who is also a black male.

Plaintiff nevertheless attempts to argue that he has made a *prima facie* case, by attacking the City's motives in choosing Mr. Clark as plaintiff's replacement.  Plaintiff argues that the City chose another black male purposely, to avoid handing plaintiff a *prima facie* case.  Plaintiff also asserts that Mr. Clark was unqualified for the position.  Plaintiff has not, however, cited to this court any authority that would allow him to circumvent the well-established requirements for a *prima facie* case in this manner.  The only reason that a plaintiff is allowed to proceed past summary judgment in the absence of any direct evidence of discrimination is because the replacement of a qualified, protected worker by an unprotected worker is sufficient to raise at least an inference of discriminatory intent.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).  If, however, the plaintiff is replaced by another protected worker, no such inference is possible.  Proof that a plaintiff belongs to a racial minority, that he was qualified, and that he was fired, without more, simply fails to give rise to an inference of unlawful discrimination.  *Talley*, 61 F.3d at 1247.  Moreover, plaintiff's allegation concerning the City's bad motive in selecting Mr. Clark is only an accusation; the record is devoid of any proof, either direct or circumstantial, tending to show that Mr. Clark's choice was a ruse motivated by racial animus.  Likewise, plaintiff has cited no decision in which the court found the existence of a *prima facie* case on the basis that plaintiff's replacement, although a member of the protected class, was somehow unqualified for the job.

Upon review of the undisputed facts of record, the court determines that plaintiff has not established a *prima facie* case of discrimination by any method allowed by the Supreme Court and Sixth Circuit.  His section 1981 claim must therefore fail, and defendants are entitled to summary judgment.

### III.    Count 10:  Fourteenth Amendment Due Process Claim

As noted above, plaintiff's fourth amended complaint alleges a due-process claim that was dismissed by stipulation after the filing of defendant's summary judgment motion.  The stipulation and order of dismissal would be ground enough to reject this claim.  Plaintiff's counsel, however, continued to press this claim in their brief and at oral argument.  Because any due-process claim is untenable on the facts of this case, the court will adjudicate this claim, even though it was technically dismissed, to spare the parties and the court system the expense of further litigation of a meritless claim.

The Fourteenth Amendment to the Constitution prohibits the states from depriving a person of life, liberty or property without due process of law.  In the employment context, a dismissed employee has the right to due process only if termination deprived him of a protected property or liberty interest.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). The record before the court conclusively demonstrates that plaintiff was not deprived of either property or liberty in connection with the City's decision to terminate his employment.

### A.    Property Interest

To establish a protected *property* interest in a particular benefit, a plaintiff must have a "legitimate claim of entitlement to it."  *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see*

*Richardson v. Township of Brady*, 218 F.3d 508, 517 (6th Cir. 2000). Property interests are generally not created by the Fourteenth Amendment; instead, they are created and defined by independent sources, such as state law. *Loudermill*, 470 U.S. at 538.

In two landmark cases, the Supreme Court held that the concept of property can include benefits conferred by certain contracts with government agencies. In *Perry v. Sindermann*, 408 U.S. 593 (1972), the Court held that a professor's contract of employment providing for termination only for cause created a property right protected by the Fourteenth Amendment. 408 U.S. at 599-601. In *Board of Regents v. Roth*, 408 U.S. 564 (1972), the Court refused to find a property interest arising from a one-year contract of a non-tenured teacher. In the wake of *Perry* and *Roth*, the federal courts hold that a property interest arises where the contract itself includes a provision that the state entity can terminate the contract only for cause. *See, e.g., Loudermill*, 470 U.S. at 538-39; *Elsag Bailey, Inc. v. City of Detroit*, 975 F. Supp. 993, 999 (E.D. Mich. 1997). By contrast, it is now settled that at-will employment entails no property interest protectible under the Due Process Clause. *See Brown v. City of Niota*, 214 F.3d 718, 722 (6th Cir. 2000); *Ludwig v. Board of Trustees*, 123 F.3d 404, 408 (6th Cir. 1997). Michigan law is to the same effect. An at-will employee has no property interest in continued employment, as long as the employee has not been promised termination only for just cause. *See Manning v. City of Hazel Park*, 509 N.W.2d 874, 878-79 (Mich. Ct. App. 1993); *Garner v. Michigan State Univ.*, 462 N.W.2d 832, 836 (Mich. Ct. App. 1990).

The factual record in the present case conclusively establishes that plaintiff was an at-will employee of the City of Battle Creek. Defendants' request to admit no. 7, served pursuant to Fed. R. Civ. P. 36, asked plaintiff to admit that "your employment with the City as Streets and

Parks Superintendent was at will," to which plaintiff answered, "Admit." (*See* Def. Ex. A, docket # 69). An answer to a request for admissions is binding upon the party making it and may be relied upon by the opposing party to establish that there is no genuine issue of material fact for purposes of summary judgment under Rule 56. *See Carney v. IRS (In re Carney)*, 258 F.3d 415, 419-421 (5th Cir. 2001); *Airco Indus. Gases, Inc. v. Teamsters Welfare Pension Fund*, 850 F.2d 1028, 1036 (3d Cir. 1988); *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir. 1987); *Williams v. City of Dothan, Ala.*, 818 F.2d 755, 762 (11th Cir. 1987); *Underberg v. United States*, No. 03-193 MCA/RLP, ___ F. Supp. 2d ___, 2005 WL 678745, at * 3-4 (D.N.M. 2005). Plaintiff's sworn testimony at his deposition was to the same effect. These admissions conclusively establish that plaintiff was an at-will employee.

In their summary judgment briefing and again at oral argument, however, plaintiff's attorneys contended that the City's personnel directives created a reasonable expectation of good-cause employment. As noted, such a claim is governed by Michigan law. Michigan law presumes that employment for an indefinite duration is terminable at the will of either party. *See Lytle v. Malady*, 579 N.W.2d 906, 910 (Mich. 1998). In *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980), the Michigan Supreme Court recognized that the presumption of at-will employment may be overcome by proof of a contractual provision forbidding discharge absent good cause. *See Rood v. General Dynamics Corp.*, 507 N.W.2d 591, 597 (Mich.1993). Under this holding, a just-cause contract may be implied in law because the employer's statement regarding its policies and procedures instills a "legitimate expectation of job security in the employee." *Rood*, 507 N.W.2d at 598. When a policy manual is alleged to create such an expectation, the court must decide whether the sections thereof that address employee discharge are reasonably capable of being

interpreted as promises of just-cause employment.  *Lytle*, 579 N.W.2d at 911.  The Michigan

Supreme Court has not conclusively held that public employees may rely on the *Toussaint* line of

cases, which arose in the private employment context, *see Samuel v. City of Sturgis*, Nos. 94-1042,

94-1087, 1995 WL 396206, at * 3 (6th Cir. July 5, 1995), but the Michigan Court of Appeals has

expressly held that *Toussaint* applies to public employees.  *See Bracco v. Michigan Tech. Univ.*, 588

N.W.2d 467, 471 n.5 (Mich. Ct. App. 1998) ("We believe, and now definitively hold, that a wrongful

discharge claim based on *Toussaint* is applicable to public employees."); *see also Meagher v. Wayne*

*State Univ.*, 565 N.W.2d 401, 414 (Mich. Ct. App. 1997).

        Assuming that the *Toussaint* line of decisions would allow a public employee to

establish an implied just-cause contract, and therefore a potential property interest, examination of

the policies of the City of Battle Creek discloses no basis for such a finding under Michigan law.

Chapter 296 of the City Administrative Code deals directly with discipline, demotion, and discharge

of employees.  (*See* Def. Ex. G, docket # 72).  Section 296.02 establishes a system of progressive

discipline to ensure fairness in the workplace.  Section 296.03 establishes a nonexclusive list of

dischargeable offenses which are "at the discretion of the department head and the director of

Employee Relations," grounds for termination.  The list is expressly not exhaustive, as it includes

"any other offense of equal magnitude to the above."  (§ 296.03(x)).  Chapter 296 of the

Administrative Code does not state or imply that employees may be terminated only for just cause.

The Michigan courts have squarely held that neither the existence of a progressive discipline system

nor a nonexclusive listing of dischargeable offenses is sufficient to create a reasonable expectation

of just-cause employment.  *See Dolan v. Continental Airlines/Continental Express*, 563 N.W.2d 23,

30 (Mich. 1997); *Rowe v. Montgomery Ward*, 473 N.W.2d 268, 275-76 (Mich. 1991); *accord*

-27-

*Mannix v. City of Monroe*, 348 F.3d 526, 534-35 (6th Cir. 2003) (applying Michigan law); *Jarema v. Olin Corp.*, 4 F.3d 426, 428 (6th Cir. 1993) (same); *Baggs v. Eagle-Picher Indus., Inc.*, 957 F.2d 268, 271 (6th Cir. 1992); *Biggs v. Hilton Hotel Corp.*, 486 N.W.2d 61, 63 (Mich. Ct. App. 1992).

The only provision that plaintiff's counsel can point to appears in the definitional section of the City's classification plan, chapter 288 of the Administrative Code. In the course of defining terms, this chapter defines "dismissal" as "permanent separation from City service for inefficiency, misconduct, repeated infractions of the rules or other just cause." (§ 288.01(9)). The chapter then goes on to empower the city manager to promulgate a classification plan and job descriptions, but does not purport to deal with either the substance or the procedure relevant to city employment. Rather, these details are dealt with in chapter 296 which, as noted above, does not provide for just cause employment. (Plf. Ex. C, docket # 92).

Under Michigan law, the court must determine as a matter of law whether language relied upon by an employee is "reasonably capable of instilling a legitimate expectation of just-cause employment." *Lytle v. Malady*, 579 N.W.2d 906, 911 (Mich. 1998); *Rood*, 507 N.W.2d at 607. This court concludes that no reasonable person viewing the language in section 228.01(9) could conclude that this definitional section of the city classification plan promised just-cause employment. Further, it is incumbent upon plaintiff to present evidence raising a triable issue of fact concerning the existence of a legitimate expectation arising from such language. *Lytle*, 579 N.W.2d at 912-14. As noted above, plaintiff has presented no evidence of reliance on the definitional section of the classification plan. To the contrary, his unequivocal testimony is that his employment was at will.

For the foregoing reasons, the court determines that plaintiff was an at-will employee and had no property interest protectible under the Due Process Clause. Consequently, plaintiff was

not entitled to process, either before or after his termination, and his due-process claim must fail. *See Bishop v. Wood*, 426 U.S. 341, 343-48 (1976).

B.     Liberty Interest

A person terminated from public employment may also suffer the loss of liberty. A person's reputation, good name, honor and integrity are among the liberty interests protected by the Due Process Clause. *See Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989). A deprivation of such interests must be accompanied by notice and an opportunity to be heard to refute any charges against the person. *Id.* A name-clearing hearing is required "only if the employer creates a false and defamatory impression about a particular employee in connection with his termination." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002). The Sixth Circuit has identified five elements that must be satisfied to establish that a plaintiff was deprived of a liberty interest entitling him to a name-clearing hearing:

> A liberty interest in one's reputation is implicated, therefore, only when five elements are satisfied. First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment. Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance. "A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation." *Chilingirian*, 882 F.3d at 205-06 n.8. Rather, to implicate the Due Process Clause, the employer must have made a statement in the course of the employee's discharge "that might seriously damage his standing and associations in the community" or that might impose "on him a stigma or other disability that [would] foreclose[ ] his freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 573. A moral stigma such as immorality or dishonesty is required to show a deprivation of liberty.
>
> Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

-29-

*Ludwig v. Board of Trustees*, 123 F.3d 404, 410 (6th Cir. 1997) (citations omitted); *accord Brown v. City of Niota, Tenn.*, 214 F.3d 718, 722-23 (6th Cir. 2000).  Once the plaintiff has established the existence of all five elements, plaintiff is entitled to a name-clearing hearing if he requests one. *Brown*, 214 F.3d at 723.  Plaintiff has not established entitlement to relief under these principles, for three separate reasons.

First, plaintiff has not established the existence of any stigmatizing statement. Neither the pleadings nor the proof contain any statement by defendants alleged to be stigmatizing. As the Sixth Circuit has made clear, plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance. *Ludwig*, 123 F.3d at 410.  The reasons for plaintiff's termination were insubordination, violation of the workplace violence policy, and making a false report, which do not qualify as stigmatizing statements.

Second, there is absolutely no evidence of publication.  It is well settled that a plaintiff seeking to recover on this theory must plead and prove that the reasons for the discharge were publicly disclosed.  *See Board of Curators v. Horowitz*, 435 U.S. 78, 83-84 (1978).

Finally, even assuming that plaintiff has been the victim of publication of a stigmatizing statement, he has not been deprived of a liberty without due process of law.  The doctrine that plaintiff invokes is narrow.  It requires only that the employer provide a name-clearing hearing if so requested.  *See Quinn*, 293 F.3d at 321 (failure to request a name-clearing hearing is fatal to a plaintiff's claim).  Plaintiff did not request a name-clearing hearing.  The only request for a hearing (Hearing Ex. 1) was not sufficient under Sixth Circuit authority.  A request for a name-clearing hearing must be specific enough to alert the employer that the employee is complaining of

-30-

a lack of due process in connection with a liberty interest as opposed to a property interest.  *See*

*Ludwig*, 123 F.3d at 411; *accord Quinn*, 293 F.3d at 321-22; *Brown*, 214 F.3d at 723.  Plaintiff's

letter did not mention any damage to reputation or stigmatizing statement.  "[A] plaintiff who fails

to allege that he has requested a hearing and was denied the same has no cause of action."  *Quinn*,

293 F.3d at 323.

       In the absence of any recognized property or liberty interest, plaintiff's withdrawn

due-process claim must be rejected.

### IV.    State Constitutional Claim

       Plaintiff contends that he was denied "fair and just treatment" in violation of Article

I, § 17 of Michigan's 1963 Constitution.  Plaintiff's brief describes this theory as a state-law

"constitutional issue of first impression."  (Plf. Brief at 14, docket # 92).  The parties have cited only

one published state appellate decision treating this claim.

       "Supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right."  *Habich*

*v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003).  In its discretion, the court declines to

exercise supplemental jurisdiction.  Plaintiff's claim based on Michigan's constitution is a novel

theory, a theory that the state courts should be allowed to define and apply.  28 U.S.C. § 1367(c)(1);

*see  Cooper v. Parrish*, 203 F.3d 937, 953 (6th Cir. 2000).  Dismissal is also warranted under 28

U.S.C. § 1367(c)(3).  Generally where, as here, all federal claims have been dismissed, federal courts

decline to exercise supplemental jurisdiction over purported state-law claims.  *See Mays v. Buckeye*

*Rural Elec. Coop., Inc.*, 277 F.3d 873, 881-82 (6th Cir. 2002); *see also Mallory v. Ohio Univ.*, No.

01-4111, 2003 WL 22146132, at * 6 (6th Cir. Sept. 11, 2003) ("The usual course is for the district

court to dismiss state-law claims without prejudice if all federal claims are disposed of on summary judgment.").  Accordingly, plaintiff's state-law claim will be dismissed without prejudice.

## **Conclusion**

For the reasons set forth herein, defendants' motion for summary judgment will be granted on all plaintiff's federal claims.  The court will decline to exercise supplemental jurisdiction over plaintiff's state-law claim under the state constitution.

Dated:   May 10, 2005                              /s/  Joseph G. Scoville_____
                                                   United States Magistrate Judge